UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SOUND SURGICAL
TECHNOLOGIES, LLC,

              Plaintiff,

vs.                              Case No. 8:10-CV-970-T-27MAP

LEONARD A. RUBINSTEIN, M.D., P.A.,
and LEONARD A. RUBINSTEIN, M.D.,

              Defendants.

_____/

## ORDER

**BEFORE THE COURT** is Plaintiff's Motion for Preliminary Injunction (Dkt. 3) and the parties' affidavits supporting and opposing the motion (Dkts. 4, 5, 14, 17, 19).[1] Having considered the parties' submissions and the arguments of counsel at the June 2, 2010, hearing, the Court concludes that Plaintiff's motion should be GRANTED in part.

### *Background*

Plaintiff Sound Surgical Technologies, LLC ("Plaintiff or "SST") manufactures and distributes the VASER System, which is an ultrasonic surgical system used by physicians to perform ultrasound-assisted lipoplasty.[2] Defendant Leonard A. Rubinstein, M.D., P.A. ("Rubinstein P.A.") is a Florida corporation operating as a medical practice in Sarasota County. Defs. Ans., Dkt. 22, ¶

---

[1] Although represented by counsel, Defendants filed no memorandum of law in opposition to the motion. *See* Local Rule 3.01(b) ("Each party opposing a motion . . . shall file within fourteen (14) days after service of the motion . . . a response that includes a *memorandum of legal authority* in opposition to the request . . . ." (emphasis added).

[2] April 12, 2010 Affidavit of Daniel S. Goldberger ("Goldberger Aff. [Dkt. 4]) ¶ 1.

2.   Rubinstein, P.A. is owned and operated by Defendant Leonard A. Rubinstein, M.D. ("Rubinstein").   *Id.*   In his practice, Rubinstein offers, among other services, cosmetic surgery, including lipoplasty. *Id.*; Goldberger Aff. ¶ 2.

About February 26, 2007, Plaintiff entered into a License and Use Agreement (the "LUA" [Dkt. 5 at 15-19]) with Rubinstein P.A.  *Id.*; Dkt. 22, ¶ 14.  Pursuant to the LUA, Rubinstein P.A. was granted a nonexclusive license to use Plaintiff's VASER System (or, as, as Rubinstein calls it, Plaintiff's VASER LIPOSELECTION System).  The agreement also granted Rubinstein P.A. the right to use Plaintiff's registered trademark VASER[3] and Plaintiff's registered service mark LIPOSELECTION,[4] subject to Plaintiff's prior review and approval of any proposed use of the marks in any manner other than on marketing materials provided by Plaintiff, "including use on [Rubinstein P.A.'s] website or in other advertising or marketing material."  LUA § 1.e.

The LUA provides that its initial term commences "on the date [Rubinstein P.A.] accept[s] the Equipment (the 'Effective Date') and continues through the last day of the 24th full calendar month following such date of acceptance" unless terminated sooner as provided in the agreement. LUA § 1.a.  The LUA provides that Rubinstein P.A. may renew the LUA for additional 24-month terms "by notice given to [Plaintiff] at least 30 days prior to the end of the term then in effect . . . ." *Id.*

In their initial affidavits, John Sullivan and Daniel Goldberger, Plaintiff's chief financial officer and chief executive officer, respectively, averred that the LUA expired on March 31, 2009

---

[3]  Plaintiff's registered VASER trademark (Reg. No. 2,441,470, Apr. 3, 2001) covers a "surgical instrument, namely, an ultrasonic surgical system consisting of an ultrasonic surgical instrument to cut, fragment, and coagulate tissue, irrigator, and aspirator . . . ." Dkt. 5 at 7.

[4]  Plaintiff's registered LIPOSELECTION service mark (Reg. No. 3,000,098, Sept. 27, 2005) covers "medical services in the nature of performing ultrasonic surgical procedures . . . .." Dkt. 5 at 8.

with respect to one VASER System (the "first system") and August 31, 2009 with respect to another (the "second system").[5]  As the first system was accepted on March 9, 2007 (Dkt. 5 at 23), the LUA by its terms evidently expired as to the first device on March 31, 2009.  However, Goldberger and Sullivan do not explain how they derived the expiration date of August 31, 2009 for the second system.  Attached to Sullivan's affidavit and to the Complaint is a document entitled "Acceptance of Equipment" (Dkt. 5 at 20) that appears to be an acknowledgment by Rubinstein of Rubinstein P.A.'s receipt of a second VASER system.  The document also acknowledges that "the date of this Acceptance . . . is the Effective Date of the Agreement," *i.e.*, of the LUA (as a notation in the margin defining the "Agreement" indicates).  As the document is dated August 14, 2008, it appears to suggest that the LUA was to expire by its terms as to this VASER system on August 31, *2010* (not 2009).

Rubinstein states that, without cause, Plaintiff unilaterally terminated the LUA.[6]  In his supplemental affidavit, Goldberger denies that Plaintiff terminated the LUA and avers that it "expired of its own terms on March 31, 2009 when Dr. Rubinstein failed to give notice of intent to renew after the initial 24 month term beginning April 1, 2007."  Goldberger Supp. Aff. ¶ 4. Goldberger does not repeat his and Sullivan's averment that, as to the second system, the LUA expired on August 31, 2009.  In sum, the record contains conflicting, ambiguous evidence as to when and how the LUA expired.  However, all VASER Systems in Defendants' possession have been returned to Plaintiff.  Goldberger Aff. ¶ 3; Sullivan Aff. ¶ 7; *see also* Rubinstein Aff. at 2, 4.

About January 15, 2008, Rubinstein registered (or "reserved") with an unspecified registrar

---

[5] *See* Goldberger Aff. ¶ 3; April 8, 2010 Affidavit of John W. Sullivn ("Sullivan Aff. [Dkt. 5]) ¶ 7.

[6] May 25, 2010 Affidavit of Leonard A. Rubinstein, M.D. ("Rubinstein Aff." [Dkt. 14]) at 4.

the following eight domain names: vaserlipo.com, vaserlipo.org, vaserlipo.info, vaser-lipo.com, vaser-lipo.net, vaser-lipo.org, vaser-lipo.info, vaser-lipo.us (together, the "domain names"). Sullivan Aff. ¶ 8; *see also* Rubinstein Aff. at 1-2. Sullivan states that Defendants did not submit the proposed domain names to Plaintiff for prior approval and that the domain names were registered without Plaintiff's knowledge, authorization, or consent.[7] Goldberger states that no person having authority to commit Plaintiff ever authorized Rubinstein to use the VASER mark in any domain name or to use the VASER LIPO mark in any manner.[8]

Additionally, Sullivan avers that, in the past, when a licensee physician has requested a specialized domain name directing internet traffic to the physician's website, Plaintiff (if it approved the domain name) would register the domain name in its own name and cause the domain name to direct Internet traffic to the licensee physician's website. Sullivan Supp. Aff. ¶ 2. However, upon expiration of the pertinent license, Plaintiff would cause the domain name to direct Internet traffic to Plaintiff's official website, www.vaser.com. *Id*. Plaintiff has registered more than 280 domain names, most of which direct Internet traffic to Plaintiff's official website. *Id*. ¶ 3.

In their initial affidavits, Sullivan and Goldberger indicated that, as of April 8 and 12, 2010, respectively, the domain names channeled Internet traffic to www.larubinstein.com, the website for Defendants' medical practice, where Defendants advertise a laser-assisted lipoplasty procedure that differs significantly from Plaintiff's VASER System. Sullivan Aff. ¶ 8; Goldberger Aff. ¶ 4. Rubinstein did not dispute the fact in his initial affidavit. However, in a supplemental affidavit filed

---

[7] *See* Sullivan Aff. ¶ 8; June 2, 2010 Supplemental Affidavit of John W. Sullivan ("Sullivan Supp. Aff. [Dkt. 20]) ¶ 2; *see also* Goldberger Aff. ¶ 3.

[8] *See* May 28, 2010 Supplemental Affidavit of Daniel Goldberger ("Goldberger Supp. Aff. [Dkt. 17]) ¶ 3.

after the deadline imposed by the Court's May 10, 2010 order (Dkt. 8), Rubinstein states that, because there is no longer in effect an LUA that permits him to use Plaintiff's registered marks on his websites or other advertising relating to his medical practice, the domain names no longer direct traffic to Rubinstein's medical practice's website.[9]  Although Rubinstein does not state when the domain names ceased channeling traffic to the website for his medical practice, Rubinstein's counsel did not dispute Plaintiff's counsel's representation during oral argument that the domain names continued to do so until the day before the June 2, 2010, hearing.

Rubinstein does not state that Plaintiff specifically authorized registration of the domain names.  However, Rubinstein states generally that, during an unspecified period before Plaintiff filed its application to register the VASER LIPO marks (*i.e.*, before September 22, 2008, *see* Dkt. 5 at 11), Goldberger was aware of and consented to Rubinstein's use of the term VASER LIPO in conjunction with Rubinstein's use of Plaintiff's VASER System.  Rubinstein Aff. at 2.  Additionally, Rubinstein avers that (a) Goldberger and another authorized SST representative, James Click, were aware of and consented to Rubinstein's use of Plaintiff's VASER mark in his advertising materials and on his websites from the inception of the LUA because (a) the LUA provision authorizing use of Plaintiff's VASER mark subject to Plaintiff's prior review and approval of any proposed use of the mark does not require that Plaintiff's approval be requested or obtained *in writing* and (b) when shortly after the LUA went into effect, Rubinstein met on two occasions with members of Plaintiff's national marketing and sales departments and discussed with them his marketing methods, his use of the VASER mark in his web-advertising was "was among the subjects discussed, approved and

---

[9] June 1, 2010 Supplemental Affidavit of Leonard A. Rubinstein, M.D. ("Rubinstein Supp. Aff." [Dkt. 19]) at 3.  Both parties filed supplemental affidavits after the deadlines set by the May 10, 2010 Order and Local Rule 4.06(b).

promoted." Rubinstein Supp. Aff. at 2-3.

Rubinstein avers that in March, 2008, Goldberger initiated negotiations with Rubinstein for Plaintiff's possible purchase of the domain names from Rubinstein. Rubinstein Aff. at 2. According to Rubinstein, it was only after his refusal to sell the domain names that any question arose as to the propriety of his registration of the domain names. *Id.*

Goldberger states that, by June 2008 at the latest, he contacted Rubinstein to inform Rubinstein that he was using "the registered marks"[10] without permission and to ask him to transfer the domain names to Plaintiff. Goldberger Supp. Aff. ¶ 2.[11]  In response, Rubinstein demanded $200,000 payment to transfer the domain names to Plaintiff. *Id.* Discussions continued and in July, 2009, Goldberger and Rubinstein met to try to resolve the matter. *Id.* Rubinstein maintained his demand for $200,000. *Id.* In a July 31, 2009 email, Goldberger stated that Rubinstein was improperly using the VASER LIPO mark in his domain names, offered Rubinstein $7,500 to resolve the matter, and threatened legal action. *Id.* & Ex. A (Dkt. 17 at 4). Rubinstein rejected the offer. Goldberger Supp. Aff. ¶ 2& Ex. A (Dkt. 17 at 5-6).

### Standard

A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve

---

[10]   The VASER LIPO marks were not registered until May 26, 2009.

[11]   Rubinstein presents no evidence disputing this assertion. Although stating generally that the assertion "defies explanation," Rubinstein merely avers that he "never received any *written* communication from Mr. Goldberger or anyone else from the Plaintiff to this effect, prior to [his] receipt of Mr. Goldberger's July 31, 2009 correspondence . . . ." Rubinstein Supp. Aff. at 1-2 (emphasis added).

the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002).

### *Discussion*

#### *The Lanham Act*

A trademark infringement claim based on a federally registered mark under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), requires proof: (1) that Plaintiff has a valid mark, (2) that, without authorization, Defendants used the mark or a colorable imitation thereof in commerce in connection with the sale or advertising of goods or services, and (3) that Defendants used the mark in a manner likely to confuse consumers. *See North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008).

Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition by prohibiting the use in commerce of any designation likely to cause confusion (1) as to the user's "affiliation, connection or association" with another person or (2) as to "the origin, sponsorship, or approval of [the user's] goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a). "To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show '(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.'" *Tana v. Dantanna's*, — F.3d —, No. 09-15123, 2010 WL 2773447, at *3 (11th Cir. July 15, 2010) (quoting *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997)).[12]

---

[12] Unlike Section 32(a), Section 43(a) of the Lanham Act protects qualifying unregistered marks. *See Dantanna's*, 2010 WL 2773447, at *3 n.5 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "[T]he use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of § 43(a) where the

In determining whether a likelihood of confusion exists, the following seven factors are considered: "(1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion." *Lone Star Steakhouse & Saloon*, 122 F.3d at 1382. Of these factors, the type of mark and evidence of actual confusion are the most important. *Id.*[13]

Defendants do not challenge the validity of Plaintiff's VASER mark. Moreover, Plaintiff's registration certificate constitutes prima facie of its validity, Plaintiff's ownership of the mark, and Plaintiff's exclusive right to use the mark in connection with the goods or services specified in the certificate. *See* 15 U.S.C. § 1057(b); 15 U.S.C. § 1115(a); *Applied Info. Sciences Corp. v. eBAY, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007); *see also Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007) ("Registration establishes a rebuttable presumption that the marks are protectable or 'distinctive.'") (citing 15 U.S.C. § 1057(b)); *Thoroughbred Legends, LLC v. The Walt Disney Co.*, No. 1:07-CV-1275-BBM, 2008 WL 616253, at *8 (N.D. Ga. Feb. 12, 2008) (registration creates a rebuttable presumption of validity); *Persha v. Armour & Co.*, 239 F.2d 628, 630 (5th Cir.

---

alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." *Id.* at *3 (internal quotation marks and citation omitted). "However, only those marks that are capable of distinguishing the owner's goods from those of others, *i.e.*, that are sufficiently 'distinctive,' are eligible for federal registration or protection as common law marks under the Lanham Act." *Id.; see also* McCarthy on Trademarks and Unfair Competition (hereafter, "McCarthy") § 27:13 (4th ed. 2008). Accordingly, "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (quoting *Two Pesos, Inc.*, 505 U.S. at 768).

[13]   Some courts have held that in the Internet context, similarity of the marks, relatedness of the goods or services, and simultaneous use of the Internet as a marketing channel are the most important factors in evaluating the likelihood of confusion. *See GoTo.com v. Walt Disney Corp.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (citing *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 n.16 (9th Cir. 1999)).

1957) ("[R]egistration of a trade-mark . . . creates a prima facie, rebuttable presumption that the one

registering the mark is its owner, and that the trade-mark is valid.").[14]

Furthermore, Defendants do not dispute that the domain names channeled Internet traffic to

the website for Defendants' medical practice, or that Defendants advertised on that website their

laser-assisted lipoplasty procedure. This use of the domain names satisfies both the Lanham Act's

jurisdictional "use in commerce" requirement[15] and Section 15 U.S.C. § 1114(1)'s requirement of

use in connection with the sale or advertising of goods or services.[16]

During oral argument, Defendants advanced a single argument in opposition to Plaintiff's

motion. Defendants argued that their use of Plaintiff's marks was authorized. *See also* Dkt. 22 at

4. As evidence of such authorization, Defendants apparently rely on the LUA and Rubinstein's

averments that (a) SST representatives were aware of and approved (albeit not in writing)

---

[14] The Eleventh Circuit adopted as binding precedent, all decisions the former Fifth Circuit made prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981). During oral argument, Plaintiff's counsel stated that the VASER mark has become "incontestable" pursuant to 15 U.S.C. 1065. *See* 15 U.S.C. § 1115(b) ("To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be *conclusive* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.") (emphasis added). However, Plaintiff presents no evidence of its compliance with the statutory formalities required for incontestability. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 117 n.3 (1st Cir. 2006) ("A mark becomes incontestable when its owner files an affidavit with the PTO attesting that the following requirements have been met: (i) there has been no final decision adverse to its ownership or enforcement rights for the preceding five-year period; (ii) there is no pending case or proceeding regarding the owner's rights in the mark; and (iii) the owner is still using the mark.") (citing 15 U.S.C. § 1065). Plaintiff's certificate of registration for the VASER mark (Dkt. 5 at 7) does not indicate the filing of the required "Section 15" affidavit. *See* Trademark Manual of Examining Procedure [TMEP] § 1605 (4th ed.) ("When a §15 affidavit complies with the requirements of the statute and rules, the USPTO updates its records to acknowledge receipt of the affidavit and sends a notice of acknowledgment to the owner of the registration.").

[15] *See Axiom Worldwide*, 522 F.3d at 1218 n.5 (noting that "[t]he Lanham Act defines 'commerce' broadly for jurisdictional purposes as 'all commerce which may lawfully be regulated by Congress.'") (quoting15 U.S.C. § 1127); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (describing the "use in commerce" as a "jurisdictional predicate").

[16] *See Axiom Worldwide*, 522 F.3d at 1218-19 (defendant's use of plaintiff's trademarks as metatags in advertising their product on the Internet "constitute[d] a use in commerce in connection with the advertising of any goods" under the plain meaning of 15 U.S.C.§ 1114(1)).

Rubinstein's use of the mark VASER in his advertising materials and on his websites and (b) before Plaintiff filed its application to register the VASER LIPO marks, Goldberger was aware of and consented to Rubinstein's use of the term VASER LIPO in conjunction with Rubinstein's use of Plaintiff's VASER System.

"[W]here the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998) ("[I]n order to prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant *without the registrant's consent* and that the unauthorized use was likely to deceive, cause confusion, or result in mistake.") (emphasis added). However, once the license has expired, use of the formerly licensed trademark ordinarily constitutes infringement. *See Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975).[17] "In sum, the law is simple. If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the licensed mark. Any such use is without the trademark owner's consent and constitutes infringement." McCarthy § 25:31. Here, by all accounts, any authorization Defendants had to use the VASER mark was conferred by or within the context of the LUA. Hence Rubinstein's right to use the VASER mark expired once the LUA was no longer in effect.

Defendants contend that Plaintiff unilaterally terminated the LUA without cause. Although

---

[17] *See also Burger King Corp. v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. . . . Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated."); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) ("The likelihood of confusion exits as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license.") (citing *Mason*, 710 F.2d at 1492-93).

the question is unsettled, there is authority for the proposition that a licensor seeking to enjoin continued use of its mark after termination of a licensing agreement must make some showing that the licensor was entitled to terminate the agreement. *See Computer Currents Pub. Corp. v. Jaye Commc'ns, Inc.*, 968 F. Supp. 684, 688 (N.D. Ga. 1997); *Robertson*, 147 F.3d at 1308 (dicta) (preliminary injunction based on former franchisee's unauthorized trademark use "necessitates some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the *unauthorized* use of trademarks by the former franchisee.") (emphasis in original).

Here, disputed facts preclude a finding, absent an evidentiary hearing,[18] that the LUA was unlawfully terminated (as Rubinstein avers) or expired by its terms (as Plaintiff contends). However, both parties have treated the LUA as terminated or cancelled or avoided or, in short, as no longer in effect. For instance, Defendants returned all the VASER Systems in their possession to Plaintiff. Goldberger Aff. ¶ 3; Sullivan Aff. ¶ 7; *see also* Rubinstein Aff. at 2, 4; Rubinstein Supp. Aff. at 2 (admitting the LUA is "no longer . . . in effect"). Defendants were not entitled to treat the LUA as no longer in effect for other purposes but at the same time continue to use Plaintiff's mark. *Cf. S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) ("Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits.) (emphasis added). In the

---

[18] Neither party requested leave pursuant to Local Rule 4.06(b) to present live testimony or additional evidence at the at the June 2, 2010, hearing.

circumstances, even if Plaintiff unlawfully terminated the LUA, Defendants' continued use of Plaintiff's marks was unauthorized.

Words in domain names often communicate information as to the source or sponsor of the associated web site. *PACCAR Inc. v. TeleScan Tech., L.L.C.*, 319 F.3d 243, 250 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)). "[W]hen a firm uses a competitor's trademark in the domain name of its web site, users are likely to be confused as to its source or sponsorship." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999). Slight differences between domain names and marks, such as the addition of generic words or words describing the product or service, ordinarily will not prevent a likelihood of confusion. *See* McCarthy § 23:50; *Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc.*, 161 F. Supp. 2d 1339, 1351-52 (S.D. Fla. 2001) (addition of "sex" or "sexy" to the "Victoria's Secret" Mark did not dispel confusion).[19] "Whether an addition is sufficient to prevent confusion in a particular instance depends upon the strength of the main part of the mark and the distinctiveness of the additional feature." *Sun Banks of Florida, Inc. v. Sun Fed. Sav. and Loan Assoc.*, 651 F.2d 311, 316 (5th Cir. 1981) (quoting 3 Callmann, Law of Trademarks § 82.1(i), at 722).

Based on the evidence presented, the Court finds that (1) Plaintiff's VASER mark is fanciful or coined and therefore relatively strong, *see John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir. 1983), (2) as they differ from Plaintiff's mark only by the addition of the generic

---

[19] *See also PACCAR, Inc. v. Telescan Techs., L.L.C.*, 115 F. Supp. 2d 772, 777-78 (E.D. Mich. 2000) (addition of words such as "trucks," "used trucks," and "new trucks" did not eliminate likelihood of confusion with the plaintiff's PETERBILT and KENWORTH trademarks), *aff'd in part and vacated in part on other grounds*, 319 F.3d 243, 250 (6th Cir. 2003) ; *cf.* TMEP § 1207.01(b)(iii) ("It is a general rule that likelihood of confusion is not avoided between otherwise confusingly similar marks merely by adding . . . matter that is descriptive or suggestive of the named goods or services.").

term "Lipo" (in some instances after a hyphen), and by the addition of a generic top level domain that does nothing to distinguish the domain names from Plaintiff's mark, *see Image Online Design, Inc. v. Core Ass'n*, 120 F. Supp. 2d 870, 877-78 (C.D. Cal. 2000), the domain names used by Defendants are very similar in appearance, sound, and meaning to Plaintiff's VASER mark, (3) both marks are used in connection with lipoplasty services, (4) both parties market their lipoplasty services on the Internet, *see PACCAR*, 319 F.3d at 252-53 (marketing by both parties on the Internet increases the likelihood of confusion), and (5) Defendants have used the domain names in connection with their use or advertising of Plaintiff's VASER System.[20]

This evidence sufficiently demonstrates that the domain names as used were likely to confuse or mislead consumers familiar with Plaintiff's VASER System as to Plaintiff's affiliation with or sponsorship of Defendants' lipoplasty services. Defendants present no evidence that any such confusion would be dispelled by the contents of their website. Although Plaintiff presents no evidence of actual confusion, none is required. *See Montgomery v. Noga*, 168 F.3d 1282, 1302 (11th Cir.1999) ("[A] plaintiff is not required to provide evidence of actual confusion in order to prove likelihood of confusion. Instead, actual confusion is merely one of several factors that may be relevant in analyzing whether there is a likelihood of confusion between two marks.") (internal citation omitted). Accordingly, Plaintiff is likely to succeed on its claims under the Lanham Act based on Defendants' use of domain names incorporating Plaintiff's VASER mark.[21]

---

[20] *See* Rubinstein Aff. at 2 (stating that Goldberger was aware of Rubinstein's "use of the term 'VASER LIPO' in conjunction with [his] use of Plaintiff's VASER LIPOSELECTION System . . . .").

[21] To the extent Plaintiff contends that Rubinstein's registration of the domain names itself violated the Lanham Act, the Court rejects the contention because registration of a domain name, without more, does not constitute commercial use. *See Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1250 (11th Cir. 2009) (affirming order granting summary judgment to defendant on the plaintiff's claim under Section 32(a) of the Lanham Act in part because plaintiff failed to show a use in commerce. "Because [defendant's] diamondbrite.com domain

As to the VASER LIPO marks, although Defendants apparently assert that they are senior users of the marks, *see* Dkt. 22. at 5, Defendants present no substantial evidence to rebut the presumption created by Plaintiff's registration that Plaintiff has an exclusive right to use the marks in connection with the goods and services listed in its registration certificates. *See Brookfield Commc'ns*, 174 F.3d at 1047 (noting that the presumption can be rebutted "by showing that [the defendant] used the mark in commerce first, since a fundamental tenet of trademark law is that ownership of an inherently distinctive mark . . . is governed by priority of use.").

Without explanation, Sullivan states that Plaintiff first used the VASER LIPO trademark and service mark in commerce on February 15 and October 8, 2008, respectively, Sullivan Aff. ¶ 4; *see also* Dkt. 5 at 11-12. More important here, the registration certificates are evidence of Plaintiff's use of the VASER LIPO trademark and service mark as of the date the applications were filed, *i.e.*, September 22, 2008, and October 10, 2008, respectively. *See* 15 U.S.C. § 1057(c); " *Brookfield Commc'ns*, 174 F.3d at 1051 n.13 ("Because 'MovieBuff' is a federally registered trademark . . . [Plaintiff] is entitled to a presumptive first used date equivalent to the filing date of its trademark

---

name does not sell or advertise any goods or services, no use of it in commerce is readily apparent."); *Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp. 2d 635, 648 (E.D. Mich. 2001) ("Courts overwhelmingly agree that mere registration . . . is inadequate to show infringement."); McCarthy § 23:11.50 ("Most courts have held that the use of someone else's trademark in the mere act of registering a domain name which includes the trademark, without use on the Internet or in connection with any commercial enterprise, does not trigger infringement by confusion or dilution under the Lanham Act. This is because such a reservation of a domain name is a 'use,' but is not a use in connection with goods or services and is not 'commercial.'"). The Court also rejects Defendants' contention that they obtained from Plaintiff a general release that precludes Plaintiff's claims. Rubinstein Aff. at 2. First, the release (Dkt. 14 at 4), executed in connection with the return of one of Plaintiff's VASER Systems, by its terms covers only liability arising from the returned equipment. Second, the release could not in any event be construed to release claims based on Defendant's future use of Plaintiff's marks. Third, Plaintiff presents evidence that the person who executed the release, a contractor retained to pick up the equipment, had no actual authority to act on Plaintiff's behalf other than to acknowledge receipt of the equipment, Goldberger Supp. Aff. ¶ 5, and Defendants present no contrary evidence supporting a finding that the contractor possessed actual or apparent authority to release the claims.

-14-

registration application . . . .").[22]  Sullivan states that, between 2007 and 2009, Plaintiff expended more than $4,000,000 in marketing its products under its marks, including the VASER LIPO marks, and that Plaintiff continues to use the VASER LIPO marks in the manufacture, distribution, marketing, sale, and leasing of the VASER System. Sullivan Aff. ¶ 5.

Rubinstein avers that it was not until after he had combined the terms "Vaser" and "Lipo" to create the combination VASER LIPO that Plaintiff applied for and obtained registration of the marks. *See* Rubinstein Aff. at 2. Moreover, Rubinstein avers that he introduced the term VASER LIPO to the market in January, 2008. *Id.* Rubinstein apparently did so in connection with his use of Plaintiff's VASER System. *See id.* (stating that, prior to Plaintiff's application to register the VASER LIPO marks, Goldberger was aware of Rubinstein's "use of the term 'VASER LIPO' in conjunction with [Rubinstein's] use of Plaintiff's VASER LIPOSELECTION System . . . .").

Even if authorized by the LUA, Rubinstein's use of the mark in connection with his use of Plaintiff's VASER System would have likely inured to the benefit of Plaintiff.[23]  Moreover, to the

_____

[22]  Plaintiff's registered VASER LIPO service mark covers "cosmetic surgery, namely, ultrasonic assisted lipoplasty" and disclaims any exclusive right to the term LIPO by itself. Dkt. 5 at 11. Plaintiff's registered VASER LIPO trademark covers an "ultrasonic instrument, namely, an ultrasonic surgical system consisting of an ultrasonic surgical instrument to cut, fragment, and coagulate tissue, irrigator and aspirator" and disclaims any exclusive right to the term LIPO by itself. Dkt. 5 at 13.

[23]  *See* 4 McCarthy § 18:45.50 ("[U]se of a designation as a mark by a qualified licensee inures to the benefit of the licensor, who as a result becomes owner of the trademark or service mark rights in the designation."); 15 U.S.C. § 1055 ("Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be."); *Turner v. HMH Pub. Co.*, 380 F.2d 224, 229 (5th Cir. 1967) ("Section 5 of the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark."). *But cf.* 37 C.F.R. § 2.38(b); T.M.E.P. § 1201.03(a) (4th ed. 2005) ("If the mark is not being used by the applicant but is being used by one or more related companies whose use inures to the benefit of the applicant under § 5 of the Act, then these facts must be disclosed in the application [for registration]."). Rubinstein suggests or speculates that Plaintiff did not disclose Rubinstein's use of the VASER LIPO mark in its application for registration. Rubinstein Aff. at 2.

extent Defendants used the VASER LIPO mark in connection with marketing Plaintiff's VASER System, *i.e.*, to identify and distinguish Plaintiff's VASER System, that use could not confer on Defendants any right to use the mark to identify and distinguish Defendants' lipoplasty services. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001) (acquisition of trademark rights requires prior adoption and use of the mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind *as those of the adopter* of the mark.") (quoting *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 417-18 (1st Cir. 1951)) (emphasis added).[24] Further, because as used it was confusingly similar to Plaintiff's VASER mark, Rubinstein's unauthorized use of the mark could not confer on Defendants any exclusive rights in the mark. *See* 15 U.S.C. § 1052(d).

Defendants also appear to contend that they were authorized to use the VASER LIPO mark. Rubinstein states that, at some time before Plaintiff filed its applications to register the VASER LIPO marks (*i.e.*, before September 22, 2008), Goldberger was aware of and consented to Rubinstein's use of the term VASER LIPO in conjunction with Rubinstein's use of Plaintiff's VASER System. However, Rubinstein does not state that Defendants obtained express authorization to register the domain names or to use domain names incorporating the mark to channel Internet traffic to the website for Defendants' medical practice, and Plaintiff presents evidence to the

---

[24] Rubinstein's contention that he invented the VASER LIPO mark is irrelevant. *See AB Electrolux v. Bermil Indus. Corp.*, 481 F. Supp. 2d 325, 330 (S.D.N.Y. 2007) ("In determining ownership of a trademark . . . creation or invention of the mark is irrelevant. The critical question is which party first used the mark in the sale of goods or services."); *Compton v. Fifth Ave. Ass'n, Inc.*, 7 F. Supp. 2d 1328, 1331 (M.D. Fla. 1998) (because ownership of a mark is determined by priority of use, the plaintiff's contention that he first conceived of the mark was "irrelevant to his ownership of the mark.").

contrary.[25]  Moreover, even if Rubinstein reasonably believed he had implied authorization to use the domain names in this manner, the authorization was expressly withdrawn by June 2008, when Goldberger informed Rubinstein that he was using Plaintiff's mark or marks without permission. Finally, any authorization Defendants had to use the VASER mark was conferred by or within the context of the LUA, and the evidence indicates that Defendants continued to use the mark after the LUA expired or was terminated (and after, as the registration certificate evidences, Plaintiff had obtained exclusive rights to use the VASER LIPO mark in connection with ultrasound-assisted lipoplasty services). Defendants' use of the domain names, which are virtually identical to Plaintiff's VASER LIPO marks, to advertise a lipoplasty procedure on a medium both parties used to advertise lipoplasty procedures was likely to confuse consumers about the sponsorship or affiliation of Defendants' lipoplasty services.  Accordingly, Plaintiff is likely to succeed on its claims under the Lanham Act based on Defendants' use of domain names incorporating Plaintiff's VASER LIPO marks.

*The ACPA*

In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting. *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004). Cybersquatting "occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to

---

[25] *See* Sullivan Aff. ¶ 8; Sullivan Supp. Aff. ¶ 2; Goldberger Supp. Aff. ¶ 3.  In an August 10, 2009 email message attached to Goldberger's Supplemental Affidavit, Rubinstein stated to Goldberger: "As you well know, both you and your marketing representative have stated to us on several occasions that we were within our rights to use 'Vaser' within *any* marketing materials.  Furthermore, you and your company *have been fully aware of our site(s)* prior to your company's unilateral decision to transition your marketing approach from 'Liposelective' to 'Vaser Lipo,' thus copying what we had previously created on our internet marketing program." (Dkt. 17 at 5-6) (emphasis added). Rubinstein does not repeat the statements in his affidavits.

-17-

profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder ." *Id.*; *see also Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (same); *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1058 (10th Cir. 2008) (although "[t]he quintessential example of a bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price," "[a] defendant could also intend to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's.").

A trademark owner asserting a claim under the ACPA must establish that "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to . . . the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." *DaimlerChrysler v. The Net Inc.*, 388 F.3d at 204; *cf. Bavaro Palace, S.A. v. Vacation Tours, Inc.*, 203 F. App'x. 252, 256 (11th Cir. 2006).

"Courts generally have held that a domain name that incorporates a trademark is confusingly similar to that mark if consumers might think that [the domain name] is used, approved, or permitted by the mark holder." *DaimlerChrysler v. The Net Inc.*, 388 F.3d at 205-206 (internal quotation marks and citation omitted). "[S]light differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." *Id.* (internal quotation marks and citation omitted); *see also* McCarthy § 25:78 ("The addition in the accused domain name of generic or descriptive matter to the mark will usually not prevent a finding of

confusing similarity."). Further, "[w]hen evaluating whether a domain name is confusingly similar to a trademark, a district court disregards the top-level domain name (*e.g.*, '.com', '.org', '.net' etc.)." *Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 126 n.36 (D. Conn. 2002) (citing *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497-98 (2d Cir. 2000)). "The fact that confusion about a website's source or sponsorship could be resolved by visiting the website is not relevant to whether the domain name itself is identical or confusingly similar to a plaintiff's mark." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004).

As discussed above, Plaintiff presents unrebutted evidence of the validity of the VASER and VASER LIPO marks, and the marks are inherently distinctive. Additionally, the Court finds that the domain names are confusingly similar to Plaintiff's VASER and VASER LIPO marks.

The ACPA sets out nine non-exclusive factors that a court may consider in determining whether a defendant had a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i); *see also Southern Grouts & Mortars, Inc., v. 3M Co.*, 575 F.3d at 1244 (consideration of the factors enumerated in the statute is permissive, not mandatory); *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir.2001) ("We need not . . . march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive."):

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

-19-

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

A "bad faith intent to profit" may not be found "in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *See* 15 U.S.C. § 1125(d)(1)(B)(ii).

Although discovery may uncover additional evidence relevant to some of the factors, the evidence before the Court tends to show that Defendants have used or trafficked in the domain names with a bad faith intent to profit.

As to factor III, Defendants present some evidence that, favorably construed, tends to show initial use of the domain names in connection with a bona fide offering of goods or services.

-20-

Rubinstein's statements that, during some period before September 22, 2008, Goldberger consented to his use of the term VASER LIPO in conjunction with his use of Plaintiff's VASER System and that SST representatives consented to an unspecified use of the VASER mark in his advertising and on his websites suggest that Rubinstein may have reasonably believed, for a time, that his use of the domain names was impliedly authorized.

As to factor VI, a bad faith intent to profit from a domain name can arise either at the time of registration or at any time afterwards. *See* McCarthy. § 25:78; *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385 (2d Cir. 2003) ("If another party has trademark rights in a mark that is similar to the domain name, the domain-name registrant must use the name without a 'bad faith intent to profit,' § 1125(d)(1)(A)(i), to maintain its registration rights.").

By June 2008, Goldberger informed Rubinstein that he was using Plaintiffs' mark or marks without permission. Although Rubinstein states that Plaintiff initiated the negotiations to purchase the domain names and Rubinstein at first refused to sell them, this evidence is not dispositive. Rubinstein refused to stop using the domain names and he demanded $200,000 for their transfer. As the practice of holding domain names for ransom with an intent to profit from selling the domain names to the mark owner is "the 'paradigmatic harm' targeted by the [ACPA]," *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d at 1246 (quoting *Lucas Nursery and Landscaping v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004)), Rubinstein's exorbitant demand supports a finding that he trafficked in the domain names with a bad faith intent to profit. *See Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003) (defendant trafficked in the domain name fordworld.com when he offered to sell it to Ford). Although an offer to sell a domain name does not by itself evidence unlawful trafficking, *see Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d at 270, an exorbitant

-21-

offer (*i.e.*, one far beyond any out-of-pocket-costs associated with registering and maintaining the domain names) by a licensee who had no right to use the domain names in the only way he had ever used them supports a finding of a bad faith intent to profit.

As to factor V, Defendants' continued unauthorized use of the domain names after the LUA was no longer in effect supports a reasonable inference that Defendants intended to exploit consumer confusion created by the similarity of the domain names to Plaintiff's marks to divert consumers seeking lipoplasty services from Plaintiff's website to Defendants' website for commercial gain.

In sum, although the question is close and the evidence presented as to the scope of Defendants' authorization to use Plaintiff's marks is limited, the Court finds that Plaintiff has met its burden of showing a likelihood of success on the merits of its claim under the Anticybersquatting Consumer Protection Act.

Next, even if Plaintiff is not entitled to a presumption of irreparable harm,[26] the Court finds that Plaintiff has shown a substantial threat of consumer confusion and resulting irreparable harm to its reputation and the goodwill represented by its marks. *See Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("There is a compelling need for [preliminary] injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder."). Injunctive relief poses no threat of harm to Defendants, as they have effectively admitted that they no right to continued use of the domain

---

[26] In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006), the Supreme Court rejected a "general rule" that presumed irreparable injury in deciding whether to grant a permanent injunction in patent cases. In *Axiom Worldwide*, 522 F.3d at 1228, the Eleventh Circuit noted but declined to decide the question whether the presumption of irreparable injury in a trademark infringement case required by the Eleventh Circuit's earlier precedent, *see Robertson*, 147 F.3d at 1310, "is the equivalent of the categorical rules rejected by the [Supreme] Court in *eBay*."

names. *See* Rubinstein Supp. Aff. at 2 (stating that, because there is no longer in effect an LUA that permits him to use Plaintiff's registered marks on his websites or other advertising relating to his medical practice, the domain names no longer direct traffic to the website for Rubinstein's medical practice).  Additionally, an injunction will also serve the public interest by protecting consumers seeking lipoplasty services from confusion as to Plaintiff's affiliation with or sponsorship of Defendants' services. *See BellSouth Adver. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991) ("In a trademark infringement or unfair competition case, a third party, the consuming public, is present and its interests are paramount.").

Although Defendants indicated that they have ceased commercial use of the domain names, Defendants' continued infringement after Plaintiff's cease and desist letters, *see* Goldberger Supp. Aff. ¶ 2, and retention of the domain names creates a cognizable danger of further violations of the Lanham Act.  Additionally, as the ACPA expressly authorizes transfer of a domain name to the owner of the mark after finding an ACPA violation, *see* 15 U.S.C. § 1125(d)(1)(C); *see also DaimlerChrysler v. The Net Inc.*, 388 F.3d at 207 n.4, the Court will direct Rubinstein either to set the domain names to resolve to Plaintiff's official website or to transfer the domain names to Plaintiff pending a resolution of the merits of this lawsuit.

### *Conclusion*

Plaintiff's Motion for Preliminary Injunction (Dkt. 3) is **GRANTED** in part as follows.

**IT IS ORDERED** that Defendants are hereby preliminarily enjoined from using Plaintiff's VASER and VASER LIPO marks in any manner in the offer or sale or advertising of any goods or services, including laser-assisted lipoplasty.

**IT IS FURTHER ORDERED** that Defendant Rubinstein shall forthwith either transfer the

domain names vaserlipo.com, vaserlipo.org, vaserlipo.info, vaser-lipo.com, vaser-lipo.net, vaser-lipo.org, vaser-lipo.info, vaser-lipo.us to Plaintiff or set the domain names to resolve to the IP address for Plaintiff's official website, www.vaser.com, pending a resolution of the merits of this lawsuit.

This preliminary injunction will remain in effect until further notice and at least until Plaintiff's claims are resolved on the merits.

Pursuant to Fed. R. Civ. P. 65(c), as a condition to this injunction, Plaintiff shall post security in the amount of **$5,000** on or before **August 16, 2010**.

**DONE AND ORDERED** in chambers this _11th_ day of August, 2010.

_____
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record